UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

| | | |
|---|---|---|
| **CHARLES GUIDRY,** | § § | |
| **Plaintiff,** | § § | |
| | § | CIV NO. 03:06-cv-513 |
| v. | § § | |
| **FAIRWAYS OFFSHORE EXPLORATION, INC.; GRASSO ENTERPRISES, INC.; and DeLEON & ASSOCIATES, L.L.C.,** | § § § § § | |
| **Defendants.** | § § | |

## MEMORANDUM AND ORDER

Pending before the Court are Motions for Summary Judgment from Defendants Fairways Offshore Exploration, Inc., Grasso Enterprises, Inc., and DeLeon & Associates, L.L.C. For the reasons that follow, DeLeon & Associates, L.L.C.'s Motion (Doc. No. 70 amended by Doc. No. 83) should be denied.

Defendant Grasso Enterprises, Inc.'s Motion for Summary Judgment (Doc. No. 68 supplemented by Doc. No. 82) and Defendant Fairways Offshore Exploration, Inc.'s Motion for Summary Judgment (Doc. No. 81) are moot because Defendants have settled with Plaintiff and a conditional order of dismissal will be entered as to these two Defendants.

**I.   BACKGROUND**

This is a personal injury action. Plaintiff Charles Guidry is an electrician employed by Total Instrument Electrical Solutions, Inc. ("TIES"). Plaintiff's firm was hired by Fairways Offshore Exploration, Inc. ("Fairways"), to perform electrical work on its platform, High Island Platform

154-JA. This platform is an unmanned offshore platform[1] affixed to the continental shelf off the Texas coast. Grasso Enterprises, Inc., operated the platform for Fairways. Several companies were working on the platform on July 11, 2006. Two different companies were likely performing construction: DeLeon & Associates, L.L.C. ("DeLeon"), and a company referred to by deponents as Trinity Services. Wood Group Production Services ("Wood Group") was there working on the generator, and TIES had been hired to supply an electrician for some electrical work. (Vasquez Dep. 27, Sept. 5, 2008.)

On July 11, 2006, Plaintiff and Thomas Garbarino of Wood Group, another electrician, left Galveston to complete what each had been told was a two to three day job for Fairways to wire up some electrical components. DeLeon was also hired to work on the platform at the time, and Plaintiff and Garbarino traveled to the platform in a chartered boat providing transportation for Kenneth Gayneaux, DeLeon's construction supervisor. During this boat ride, Gayneaux informed Plaintiff that the boat's contract expired that day because Gayneaux was going to be finished with his work on the platform (Doc. 99, Ex D, 40), and so Gayneaux would not be able to take Plaintiff out to the platform the following day. Gayneaux allegedly joked that Plaintiff should make sure he finished his work that day or he would have to stay on the platform. (Doc. No. 99 Ex D, 40.) Once they arrived at the platform, an unidentified supervisor told Garbarino that his job also had to be completed in one day. (Doc. No. 100, Ex. B, 2.) From these statements, Plaintiff and Garbarino assumed that they needed to complete all of the electrical work in one day. The two men allegedly rushed to finish.

While on the platform, sometime after the lunch hour, Plaintiff installed a metal panel weighing 80-100 lbs. with a battery charger ("the panel") in a small enclosed structure (a "doghouse") and wired it up. The installation proceeded as follows. After it was unloaded onto the

---

[1] An unmanned offshore platform is a platform without overnight living quarters.

platform, one unnamed man dragged the panel across the boat deck to the doghouse and then left to return to his own work. Gayneaux may have assisted in bringing the panel near to the doghouse. Then, Plaintiff dragged the panel into the doghouse. He and Garbarino used a come-along (a mechanical lifting device) to lift the panel nearly in place. The two men, standing shoulder to shoulder, lifted the panel the last six inches. Mr. Garbarino bolted his side of the panel in place. At this moment, Plaintiff's corner dipped a bit, and as he lifted it into place to secure the bolt, Plaintiff "saw" a visual phenomenon resembling a white fuzz ball and felt a muted pain; he thought it was a weld burn. Garbarino strained his back while installing the panel although it healed without problem. (Doc. No.106, Ex I, 59.) Plaintiff and Garbarino continued with their other work on the platform. Plaintiff worked several more hours on the platform and returned to shore with Gayneaux. He did not tell anyone he had been injured.

Plaintiff subsequently brought suit against Fairways, Grasso, and DeLeon claiming negligence with regard to the circumstances surrounding the mounting of the panel. He alleged that the result was severe and permanent injury to his eyes and other parts of his body. (Pl.'s Second Am. Compl., Doc. No. 48.) This Court has admiralty jurisdiction over the lawsuit pursuant to 28 U.S.C. § 1333.

## II.  SUMMARY JUDGMENT STANDARD

A motion for summary judgment under Federal Rule of Civil Procedure 56 requires the Court to determine whether the moving party is entitled to judgment as a matter of law based on the evidence thus far presented. FED. R. CIV. P. 56(c). Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Kee v. City of Rowlett*, 247 F.3d 206, 210 (5th Cir. 2001) (quotations

omitted). A genuine issue of material fact exists if a reasonable jury could enter a verdict for the non-moving party. *Crawford v. Formosa Plastics Corp.*, 234 F.3d 899, 902 (5th Cir. 2000). The Court views all evidence in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Id.* Hearsay, conclusory allegations, unsubstantiated assertions, and unsupported speculation are not competent summary judgment evidence. F.R.C.P. 56(e)(1); *See, e.g., Eason v. Thaler*, 73 F.3d 1322, 1325 (5th Cir. 1996), *McIntosh v. Partridge*, 540 F.3d 315, 322 (5th Cir. 2008); *see also Little v. Liquid Air Corp.*, 37 F.3d 1069, 1975 (5th Cir. 1994) (noting that a non-movant's burden is "not satisfied with 'some metaphysical doubt as to the material facts.'" (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

## III. ANALYSIS

Defendant DeLeon contends that it cannot be held liable to Plaintiff as a property owner for personal injury to an independent contractor under Chapter 95 of the Texas Civil Practice and Remedies Code. In the alternative, DeLeon argues that it owed no duty to the Plaintiff. Plaintiff argues that Chapter 95 does not apply to DeLeon because it is not a property owner, and that DeLeon owed and breached a duty of care to Plaintiff and proximately caused his injuries.

### A.   Outer Continental Shelf Lands Act

Parties agree that the Outer Continental Shelf Lands Act ("OCSLA"), 43 U.S.C. §§ 1331-1356a, applies to this case. Under OCSLA, the law of the adjacent state—in this case, Texas—applies unless state law is inconsistent with federal law or regulations. 43 U.S.C. § 1333. The Southern District of Texas has clarified that for adjacent state law to apply under OCSLA: "1) the controversy must arise on a situs covered by OCSLA (i.e., the subsoil, seabed, or artificial structures permanently or temporarily attached thereto); (2) federal maritime law must not apply of

its own force; and (3) the state law must not be inconsistent with federal law." *Franks v. Chevron Corp.*, No. 3:06-cv-506, 2007 WL 2330296, at *1 (S.D. Tex. Aug. 13, 2007) (*citing Union Tex. Petroleum Corp. v. PLT Eng'g*, 895 F.2d 1043, 1047 (5th Cir.1990)).

Here, the parties do not dispute that the platform constitutes a situs covered by OCSLA. Fixed drilling platforms are "artificial islands" covered by OSCLA. *Rodrigue v. Aetna Casualty & Surety Co.*, 395 U.S. 352 (1969). Nor does either party contend that federal maritime law applies of its own force. Finally, they agree that Chapter 95 is consistent with federal law. *See Franks*, 2007 WL 2330296 at *4 (finding that the Fifth Circuit has implicitly found in several OSCLA cases that Chapter 95 was not inconsistent with federal law); *see also Arsement v. Spinnaker Exploration Co., LLC*, 400 F.3d 238 (5th. Cir. 2005) (applying Chapter 95 in a case brought under OSCLA).

**B.     Chapter 95 of the Texas Civil Practice and Remedies Code Does Not Apply to Plaintiff's Claims Against DeLeon**

Prior to the passage of Chapter 95, Texas common law controlled premises liability claims brought by an injured independent contractor who was performing work for a premises owner or contractor. *See Arsement v. Spinnaker Exploration Co., LLC*, 400 F.3d at 244. Under Texas common law, "[t]he general rule is that an owner . . . does not have a duty to see that an independent contractor performs work in a safe manner." *Redinger v. Living, Inc.*, 689 S.W.2d 415, 418 (Tex. 1985). A property owner or contractor was liable under Texas common law for negligent activity only if it retained some control over the manner in which the independent contractor performed its work and failed to take reasonable care for such control. *See, id.*

In 1996, the Texas legislature passed Chapter 95 of the Texas Civil Practice and Remedies Code as part of a broader "tort reform" effort. *See, e.g., Arsement*, 400 F.3d at 245; *Spears v. Crown Central Petroleum Corp.*, 133 Fed. Appx. 129, 130 (5th Cir. 2005) (unpublished). Chapter 95 "provide[s] greater protection for property owners" against negligent activity claims by

independent contractors. *Arsement*, 400 F.3d at 245. Where Chapter 95 applies, a property owner is not liable for injuries to an independent contractor "who constructs, repairs, renovates, or modifies an improvement to real property, including personal injury, death, or property damage arising from the failure to provide a safe workplace," unless:

> (1) the property owner exercises or retains some control over the manner in which the work is performed, other than the right to order the work to start or stop or to inspect progress or receive reports; and
> (2) the property owner had actual knowledge of the danger or condition resulting in the personal injury, death, or property damage and failed to adequately warn.

TEX. CIV. PRAC. & REM. CODE § 95.003. For property owners, Chapter 95 codifies the holding in *Redinger* regarding control, but modifies the common law approach by protecting the owner from liability unless it has *actual* knowledge of the dangerous activity resulting in the injury and fails to *adequately* warn of the danger. *Arsement*, 400 F.3d at 245; *see also Phillips v. The Dow Chemical Co.*, 186 S.W.3d 121, 132 (Tex. App.—Houston [1 Dist.] 2005).

Chapter 95 applies only to a claim:

> (1) against a property owner, contractor, or subcontractor for personal injury, death, or property damage to an owner, a contractor, or a subcontractor or an employee of a contractor or subcontractor; and
> (2) that arises from the condition or use of an improvement to real property where the contractor or subcontractor constructs, repairs, renovates, or modifies the improvement.

TEX. CIV. PRAC. & REM. CODE § 95.002. The defendant bears the burden of showing that Chapter 95 applies to a plaintiff's claim. *See Jones v. Apache Corp.*, No. G-05-499, 2007 WL 656268, at *2 (S.D. Tex. Feb. 27, 2007). Chapter 95 applies to both premises defect claims and to negligent activity claims. *Arsement*, 400 F.3d at 249 (*citing Francis v. Coastal Oil & Gas Corp.*, 130 S.W.3d 76, 84 (Tex. App.—Houston [1st Dist.] 2003, no pet.)).

Pre-Chapter 95 negligent premises and negligent activity cases did not distinguish between property owners and general or independent contractors. *Koch Ref. Co. v. Chapa*, 11 S.W.3d 153,

155 n.1 (Tex. 1999). Conversely, Chapter 95 only covers property owners. A property owner is "a person or entity that owns real property primarily used for commercial or business purposes." TEX. CIV. PRAC. & REM. CODE § 95.001.

Texas state and federal courts have extended Chapter 95 protection to property managers. *Fisher v. Lee & Chang Partnership*, 16 S.W.3d 198, 203 (Tex. App.-Houston [14th Dist.] 2000, pet. denied). In addition, Chapter 95 has been applied to platform operators who are also property owners. *See Francis v. Coastal Oil & Gas Corp.*, 130 S.W.3d at 84 (finding Chapter 95 protection for platform operators who also owned the mineral rights). By analogy, and extending the holding in *Francis v. Coastal Oil*, Chapter 95 protection has been afforded the "managers" of platforms.[2] *See Jones v. Apache Corp.*, No. 3:05-cv-499, 2007 WL 656268; *Nagle v. GOM Shelf, LLC*, No. 6:03-cv-103, 2005 WL 1515439 (S.D. Tex. June 24, 2005).

Defendant DeLeon urges that the Court apply Chapter 95 protection to bar Plaintiff's claim against it. DeLeon is not the general operator of the platform. Further, DeLeon has produced no formal, ongoing written contract with Fairways regarding services on the platform. (Doc. No. 100, Ex. G, 8.) Fairways merely hired DeLeon as an independent contractor to do part of a construction project on the platform. (Bobby Vasquez Dep. 26:15-27:3, Sept. 5, 2008.) Because DeLeon is an independent contractor and therefore not a property owner or the manager of a property owner, Chapter 95 does not apply. *See Arsement*, 400 F.3d at 251.

### C.  General Negligence and Breach of Duty

Because Chapter 95 does not govern Plaintiff's claims against DeLeon, Texas common law applies. Under the common law, contractors do not owe a duty to ensure that independent

---

[2] Although it was not disputed by the parties, the 5th Circuit has found that Chapter 95 does not apply to general or independent contractors on platforms. *Arsement*, 400 F.3d at 251.

7

contractors perform their work in a safe manner unless they retain some control over the independent contractor's work. *See discussion, supra* III.B.

A duty arises if the general contractor retains control over the manner in which the independent contractor performs its work. *Lee Lewis Const., Inc. v. Harrison*, 70 S.W.3d at 783 (Tex. 2001). To prove control in absence of a contractual agreement, the employee must show the contractor "actually exercised control over the manner in which the independent contractor's work was performed". *Dow Chemical Co. v. Bright*, 89 S.W.3d at 606. Again, the contractor must have the right to control the "means, methods, or details of the independent contractor's work". *Elliott-Williams Co., Inc. v. Diaz*, 9 S.W.3d 801, 804 (Tex.1999). This control must extend beyond the ability of the general contractor to make recommendations or suggestions that need not be followed. *Koch Refining Co. v. Chapa*, 11 S.W.3d 153 (Tex. 1999). In *Bright*, the Texas Supreme Court held there was no contractor liability when the injured party could not show the contractor was "involved in any manner with controlling the timing and sequence" of the injured party's work, and the contractor did not "decid[e] which ... employees should perform which task and at what point in time". *Bright*, 89 S.W.3d at 609.

Finally, if a general contractor requires no more than that a sub- or independent contractor follow all federal safety requirements and work safety guidelines, this oversight does not create the level of control required to impose liability on the general contactor. *See Hoechst-Celanese Corp. v. Mendez*, 967 S.W.2d 354, 356-57 (Tex. 1998). These safety guidelines raise a duty of care that arises only when the safety guidelines unreasonably increase the probability and severity of injury. *Bright*, 89 S.W.3d at 608; *Hoechst-Celanese Corp.*, 967 S.W.2d at 358.

**1. Control and Breach of Duty**

DeLeon argues that it exercised no control over the means, methods or timing and sequencing of Plaintiff's work and therefore owed Plaintiff no duty of care. It alleges that Plaintiff brought his own equipment, undertook to lift the panel of his own volition, received no instruction or direction from DeLeon about how to mount the panel with the battery charger, and DeLeon's representative was not present when Plaintiff was injured. Finally, DeLeon explains that Guidry never requested assistance from nor indicated to DeLeon that a rigger or roustabout should be performing this job.

In contrast, Plaintiff alleges that DeLeon's representative, Gayneaux, maintained control over Plaintiff's work in two ways. First, Gayneaux controlled the boat that provided transportation to the platform and therefore retained control over the timing of Plaintiff's work. Second, because Gayneaux held the responsibility for filling out a Job Safety Analysis ("JSA") for Plaintiff's work, he determined the number and type of personnel on the platform for purposes of the panel installation.

### a. DeLeon's Alleged Responsibility for Completing a JSA Does Not Create "Some Control" over Plaintiff's Work

The Fairways representative in control of the platform at the time explained the people who own the boats that take workers out to the platform have total control over the people in their boat and typically retain the responsibility for filling out a Job Safety Analysis on the boat prior to offloading people and their equipment onto the platform. (Vasquez Dep. 37-38, Sept. 5, 2008.)

Construing all evidence in the light most favorable to the non-moving party, a jury might conclude that Gayneaux should have drafted the JSA for the job. Plaintiff claims that had someone completed a JSA, this JSA would have specified that a roustabout should have installed the panel, not an electrician like the Plaintiff, and therefore Plaintiff should have never started installing the

panel in the first place. Regardless of who retained control over filling out the JSA, however, the responsibility for filling out a JSA does not necessarily create a duty of care.

For example, in *Bright*, the Texas Supreme Court found that a general contractor did not maintain actual control over an independent contractor when the general contractor had the responsibility for conducting a pre-job safety conference (another term for a JSA) and issuing a safe work permit. The Court found no control even though Plaintiff argued that the general contractor could have discovered the dangerous condition in the course of issuing the permit and declined to allow the work to proceed. *Bright*, 89 S.W.3d at 608. The Court reasoned that this type of oversight did not rise to the level of controlling the method of work or its operative details because the right to "preclude work from beginning in the first instance is insufficient to establish actual control." *Id.* The situation in *Bright*, where the Court found no evidence of control, and the facts surrounding Plaintiff's installation of the panel are distinguishable from the Texas Supreme Court's holding in *Lee Lewis Construction, Inc. v. Harrison*, 70 S.W.3d at 784. There, the Court found that a general contractor had some control over a subcontractor's work such that it owed the subcontractor a duty of care where the general contractor, in the course of a safety inspection, specifically approved a particular method of conducting a job. *Id.* Plaintiff argues that Gayneaux should have drafted a JSA assigning a roustabout to install the panel. Even this version of the facts does not support a finding that DeLeon exercised control over the manner, method, and details of Plaintiff's work or that Plaintiff was not free to conduct the job in his own way. *See Bright*, 89 S.W.3d at 608.

### b. DeLeon's Comments and Actions Create an Issue of Material Fact over Control

In addition, Plaintiff argues that DeLeon controlled the timing of the installation of the panel because Gayneaux forced him to hurry. Controlling the timing and sequencing of work may be

10

sufficient evidence to suggest control of an independent contractor's work. *See, e.g., Bright*, 89 S.W.3d at 609.

While Plaintiff was traveling to the platform, Gayneaux told him that the boat was returning to land that evening and that it was not going back out the next day because his job was going to be complete. (Doc. No. 100, Ex. D, 3-4.; Doc. 99, Ex B., 19 (Garbarino testifying to the same deadline).) Plaintiff has explained that he understands deadlines set for offshore work are firm. (Doc. No. 68, Ex. A, 10.) Plaintiff's co-electrician, Garbarino, explained that they were rushed because the job needed to be performed in only one day. Consequently, because they were rushing, Garbarino and Plaintiff decided to lift the battery charger themselves rather than waiting for help. (Doc. 99, Ex. B, 26-28.) Thus, the fact that Gayneaux may have encouraged Plaintiff and Garbarino to rush their work through his words and actions on July 11, 2006, creates a fact question as to DeLeon's control over the sequence and timing of Plaintiff's work that day. In addition, courts have found a breach of a duty of care when a supervisor forced his employees to rush. *Pichoff v. Bisso Towboat Co., Inc.*, 748 F.2d 300 (5th Cir. 1985), *superseded by statute on other grounds* (finding that general manager was negligent in insisting that a worker perform a job hurriedly despite unsafe conditions).

Finally, a jury could find that Gayneaux retained control over the manner and methods of installing the battery charger because of a conversation Plaintiff had with Gayneaux prior to the installation and a work order Gayneaux signed. Plaintiff allegedly spoke to Gayneaux about the details of installing the battery charger panel while they were together in the doghouse prior to Plaintiff's installation even though Plaintiff ultimately decided how to mount the panel. (Doc. No. 83, Ex. E, 33-34.) Gayneaux denies that he provided any direction about how to install the panel and that he simply left the panel next to the doghouse. (Doc. No. 106, Ex. K, 7; 9.) In a "Daily

11

Construction Report," however, completed by Gayneaux for the work performed on the platform on July 11, 2006, an entry on the report reads: "assisting electricians on battery charger installations." (Harold DeLeon Dep., Dep. Ex. 2, Sept. 5, 2008.) DeLeon's owner does not know exactly what was meant by this phrase, but construing all evidence in favor of Plaintiff for purposes of summary judgment, a reasonable jury could infer that this entry suggests that Gayneaux was assisting the electricians with the details and methods of the panel installation. Consequently, a jury could find that Gayneaux actually controlled Plaintiff's work by specifying how he wanted the panel to be mounted. Further, a jury could find that DeLeon failed to exercise due care in his instructions to Plaintiff regarding installation by encouraging two electricians to lift heavy objects they were not suited to carry.

Thus, a material issue of fact remains with regard to whether DeLeon had control over Plaintiff's work, creating a duty of care. Further, a material issue of fact remains as to whether that duty, if created, was breached either by encouraging Plaintiff and Garbarino to rush or by negligently controlling the manner and method of the panel installation.

### 2. Causation

In addition, there is a dispute as to a material fact with respect to causation. DeLeon argues that there is no causal connection between Plaintiff's installation of the panel and his detached retina. DeLeon's expert medical witness, Dr. Keith Bourgeois, has explained that lifting weight is not associated with an increased incidence of retina detachment. (Doc. No. 83 Ex. F, 2-3.) In his opinion, the fact that Plaintiff had received cataract surgery years prior to the incident was likely the sole reason his retina detached. *Id.*

Plaintiff alleges that, while he was bolting the panel in place, he felt a pain, later experienced vision problems, and subsequently learned that his retina had detached. One of Plaintiff's treating

12

physician, Dr. Feigon, explained that lifting a heavy panel probably detached Plaintiff's retina. (Doc. No. 83, Ex. H, 10.) DeLeon argues that this opinion does not create an issue of material fact because it is not substantiated. Dr. Feigon's testimony relies on a temporal connection between the Plaintiff's described symptoms and the lifting of the panel that Plaintiff revealed to her in the course of treatment. Dr. Feigon bases her opinion on causation on this connection and her understanding that lifting objects may detach retinas, even though she acknowledges the possibility that some other event or factor may have caused Plaintiff's retina to detach. (Doc. No. 83, Ex. H, 10-11.)

A treating physician may testify to the facts disclosed during the care and treatment of the patient. *Martin v. CSX Transportation, Inc.*, 215 F.R.D. 554, 556 (D.C. Ind. 2003) ("The majority of courts permit physicians to present their opinions formulated during the course of treating a patient."). Several courts have found that, in addition to discussing a specific diagnosis, a treating physician may opine as to the causation of a plaintiff's injuries and a plaintiff's prognosis as long as the doctor formed those opinions "based on the care-provider's personal knowledge and observations obtained during the course of care and treatment."[3] *Garcia v. City of Springfield Police Dep't*, 230 F.R.D. 247, 249 (D. Mass. 2005) (*abrogating Thomas v. Consolidated Rail Corp.*, 169 F.R.D. 1 (D. Mass. 1996)); *see also Fielden v. CSX Transp., Inc.*, 482 F.3d 866, 869 (6th Cir. 2007) (allowing a treating physician to testify to the causation of a plaintiff's injuries where the doctor "formed his opinions as to causation at the time that he treated [plaintiff]," not at the request of plaintiff's counsel, and observing "[d]etermining causation may . . . be an integral part of 'treating' a patient."). At least one circuit has found that a treating physician may testify "based on what he or she learned through actual treatment and from the plaintiff's records up to and including that treatment" when the information is gained at the time of treatment. *Fielden*, 482 F.3d at 861, 871.

---

[3] Other courts have refused to allow a treating physician testify as to causation or prognosis. *See, e.g., Zarecki v. National R.R. Passenger Corp.*, 914 F. Supp. 1566, 1573 (N.D. Ill. 1996). The Fifth Circuit has not addressed the issue, and the Court finds the analysis in cases like *Fielden* more persuasive.

Here, in Dr. Feigon's testimony she did not review the literature as a basis for her opinion and drew her conclusion on causation primarily because of the temporal association between the installation of the panel and the pain he felt immediately afterwards. (Doc. No. 82, Ex. K, 10.) Thus, Dr. Feigon's testimony as to the likely cause of Plaintiff's retina detachment comes primarily from her treatment of Plaintiff and his records up and including that time of treatment.

The issues raised by the testimony of Dr. Feigon and Plaintiff alongside the diagnosis of Defendant DeLeon's expert, Dr. Bourgeois, create a fact question as to causation sufficient to defeat Defendant DeLeon's Motion for Summary Judgment.

## IV. CONCLUSION

Defendant Fairway's Motion for Summary Judgment and Defendant Grasso's Motion for Summary Judgment are **DENIED AS MOOT.** Plaintiff's claims against Defendant Grasso and Defendant Fairways are **DISMISSED WITHOUT PREJUDICE.** Defendant DeLeon's Motion for Summary Judgment, (Doc. No. 70) amended by (Doc. No. 83), is **DENIED**.

**IT IS SO ORDERED.**
**SIGNED** this 30th day of September, 2008.

KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE